**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.**

PATRICE BOURGIER,
individually and on behalf of all others
similarly situated,

         Plaintiff,

v.                                   **CLASS ACTION**

HARTFORD CASUALTY INSURANCE
COMPANY,

                                    **JURY TRIAL DEMANDED**

         Defendant.
_____/

**CLASS ACTION COMPLAINT**

       Plaintiff Patrice Bourgier, individually and on behalf of all others similarly situated, files

this class action against the Hartford Casualty Insurance Company ("Hartford"), and in support

states the following:

**INTRODUCTION**

       1.      Plaintiff, Patrice Bourgier, is the owner and operator of a full-service salon located

at 64 Southwest 10th Street, in Miami, Florida.

       2.      To protect the salon and the income from operation of the salon, Plaintiff purchased

a property insurance policy with policy number 21 SBA BM2718 (the "Policy").

3.      The Policy was issued and underwritten by Defendant Hartford.

4.      The Policy is a bilateral contract: Plaintiff agreed to pay monthly premiums to Defendant, in exchange for Defendant's promises of coverage for certain losses.

5.      Among other types of coverage, the Policy protects Plaintiff against a loss of business income due to a suspension of the salon's operations.  This type of coverage is often referred to as business interruption coverage.

6.      The Policy also provides "Extra Expense" coverage, under which Defendant promised to pay expenses incurred to minimize the suspension of business.

7.      Additionally, the Policy provides "Civil Authority" coverage, under which Defendant promised to pay for loss of business income caused by the action of a civil authority prohibiting access to the salon.

8.      Plaintiff duly complied with its obligations under the Policy and paid the requisite premiums.

9.      The SARS CoV-2 virus, sometimes referred to as the novel coronavirus, has infected people and contaminated property across the country, including in South Florida. As of March 17, 2021, Miami-Dade County has had at least 428,872 coronavirus infections. In other words, 15.7% of Miami-Dade's population has been infected with coronavirus.[1] And because at least some infected residents have not been tested for the virus, the true number of infections is likely even higher.

---

[1]      Florida   Coronavirus   Map   and   Case   Count,   N.Y.   TIMES,   available   at https://www.nytimes.com/interactive/2020/us/florida-coronavirus-cases.html (last visited Mar. 17, 2021); COVID-19 United States Cases by County, Johns Hopkins University of Medicine Coronavirus Resource Center, available at  https://coronavirus.jhu.edu/us-map (last visited Mar. 17, 2021).

10.     The virus has a proclivity to accumulate on, contaminate, and alter the condition of property.  It can spread and linger in the air, it can accumulate in ventilation systems, and it can attach to surfaces where it can remain infectious for several days.  Moreover, given the widespread nature of coronavirus infection and contamination, even temporary solutions like cleaning and disinfection cannot eliminate the high risk of recontamination.

11.     Accordingly, there is nothing that businesses like restaurants and hair salons can practically do—other than shutting down entirely—to permanently and reliably eliminate contamination by the coronavirus.  According to experts, "there can be a high risk of COVID-19 infection in hair and nail salons, spas and barbershops even with safety precautions implemented at those establishments given the close proximity between clients and employees especially for longer lengths of time."[2]

12.     As a result, and even in the absence of government-mandated closures or restrictions on access, commercial establishments have been forced to close their businesses, severely limit and change their operations, and physically reconfigure their premises.  Businesses have made these necessary alterations to their properties in order to mitigate, prevent, and contain the contamination and re-contamination of individuals, air, and surfaces in and on their property.

13.     The combination of coronavirus contamination and these necessary physical restrictions and alterations have altered the character of businesses' properties, and seriously impaired businesses' ability to use their properties.  Therefore, over the past twelve months, businesses nationwide, including in Miami-Dade, have suffered not only physical loss of and damage to their property, but also an accompanying loss of business income.

---

[2]     *Is It Safe to Get A Hair Cut or Your Nails Done Right Now?,* UNC Health Talk (Nov. 10 2020), https://healthtalk.unchealthcare.org/is-it-safe-to-get-a-hair-cut-or-your-nails-done-right-now/ (last visited Mar. 17, 2021) (citing opinion of Emily Sickbert-Bennett, PhD, MS).

14.     Beginning in March 2020, Plaintiff was forced to close the salon as a result of contamination by the coronavirus and related government orders.  After the closure orders were lifted, the salon re-opened.  But it re-opened in a physically transformed, altered and impaired state.  Not only was the salon subject to the continuous and constant risk of recontamination, but the salon also made significant necessary physical alterations to its property to minimize, contain and mitigate coronavirus contamination.

15.     These alterations, which include but are not limited to restrictions of the physical use of the property and physical alterations to the property's layout, have severely impaired Plaintiff's ability to make use of its property.  As a result, business at the salon has slowed.  In short, Plaintiff has suffered a cessation, suspension and/or a slowdown of its business operations. In turn and as a result, Plaintiff has suffered significant losses and incurred significant expenses.

16.     Under the Policy, Defendant promised to cover these losses and expenses, and is obligated to pay for them, subject to the applicable limit of insurance.  But in blatant breach of their contractual obligations, Defendant failed to pay for these losses and expenses.

17.     Upon information and belief, Defendant failed to pay for similar losses and expenses by at least thousands of other insureds holding policies that are, in all material respects, identical.

**THE PARTIES**

18.     Plaintiff Patrice Bourgier is a Florida corporation organized to do business and doing business at 64 Southwest 10th Street, Miami-Dade, Florida 33130.

19.     Defendant Hartford Casualty Insurance Company is a Connecticut corporation with its principal place of business in Hartford, Connecticut.  It is registered to do business in Florida

and licensed by the Florida Department of Financial Services to provide insurance in the State of Florida.

20.     At all times material, Defendant engaged in substantial and not isolated activity on a continuous and systematic basis in the state of Florida, namely by issuing and selling insurance policies in Florida and by contracting to insure property located in Florida.

21.     Service of process on Defendant may be effectuated through their Registered Agent, the Florida Chief Financial Officer, 200 East Gaines Street, Tallahassee, Florida 32399.

**JURISDICTION AND VENUE**

22.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is diversity between Defendant and at least one member of each class; there are more than one hundred members of each class; and the amount in controversy exceeds $5,000,000 exclusive of interest and costs.  This Court also has subject matter jurisdiction under 28 U.S.C. §§ 2201 and 2202 and is authorized to grant declaratory relief under these statutes.

23.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to the claims occurred within the Southern District of Florida, and a substantial part of property that is subject of the action is situated in this district.

24.     This Court has personal jurisdiction over Defendant pursuant to Fla. Stat. § 48.193(1)(a) because Plaintiff's claims arise out of, among other things, Defendant conducting, engaging in, and/or carrying on business in Florida; Defendant breaching a contract in this state by failing to perform acts required by contract to be performed in this state; and Defendant contracting to insure property in Florida, including but not limited to the premises insured under the Policy.  Defendant also purposefully availed itself of the opportunity of conducting activities

in the state of Florida by marketing its insurance policies and services within the state, and intentionally developing relationships with brokers, agents, and customers within the state to insure property within the state, all of which resulted in the policy at issue in this action.

## FACTUAL BACKGROUND

### *The Policy*

25.     In May 2019, Plaintiff obtained the Policy, a property insurance policy issued and underwritten by Defendant.  The Policy has a policy period of July 3, 2019 to July 3, 2020.  The insured premises under the Policy are 64 Southwest 10th Street, in Miami-Dade, Florida, the location of the Patrice Bourgier Salon.[3]

26.     The Policy is an "all-risk" insurance policy.  This type of policy differs from a "perils" policy, which only insures for loss of or damage to property from perils specifically enumerated and identified in the policy.  In contrast to a perils policy, an all-risk policy provides coverage for losses—including business income losses—incurred as a result of *any and all* perils which are not expressly and specifically excluded.

27.     Plaintiff's all-risk policy is based on the standard all-risk policy issued by Defendant and contains no exclusion that would allow Defendant to deny coverage for losses caused by the coronavirus, necessary physical alterations to its property, and related government orders.

28.     Consistent with the all-risk nature of the Policy, Defendant specifically agreed to pay for all losses caused by "Covered Causes of Loss," defined as "RISKS OF DIRECT PHYSICAL LOSS" unless the loss is excluded under the Policy.

---

[3]     The Policy is attached to this complaint as Exhibit "A."  The Policy incorporates by express reference a number of standardized coverage forms, including forms and form language cited throughout this Complaint.

29.     Hartford's Special Property Coverage Form provides various "Additional Coverages," including Time Element coverages such as "Business Income" coverage, "Civil Authority" coverage, and "Extra Expense" coverage.

30.     As one type of Additional Coverage, the Policy provides coverage for loss of business income, often called business interruption insurance.  This coverage is specifically provided for in a section of the Policy titled "Business Income."

31.      Pursuant to this coverage, Defendant promised to pay for "Loss of Business Income" caused by a Covered Cause of Loss.  Specifically, Defendant promised to pay for the loss of Business Income sustained due to the necessary "suspension" of the insured's "operations" during the "period of restoration."

32.     Each of the operative terms of this coverage provision is defined as follows.

33.     Business Income means the net profit that the business would have earned absent the suspension of operations, plus any continuing normal operating expenses, including payroll.

34.     Suspension means, among other things, a partial slowdown or complete cessation of the insured's business activities.

35.     In addition to promising to pay for loss of Business Income, under the Policy, Defendant also promised to pay for certain necessary "Extra Expense[s]."  Extra Expenses mean expenses that the policyholder incurs to, for example, minimize the suspension of business.

36.     Under the "Civil Authority" coverage, Defendant promised to pay for the loss of Business Income and Extra Expense that the Plaintiff sustained as a result of "order of a civil authority" that prohibits access to the insured premises.

37.     This Civil Authority provision is an independent basis for business interruption coverage.  That is, it can be triggered even when the standard business interruption coverage is not.

38.     Plaintiff was forced to suspend business activities due to the coronavirus and the resultant closure orders issued by civil authorities in Florida.

39.     Plaintiff suffered direct physical loss, direct physical damage, and actual loss to its property as a result of contamination by the coronavirus, and necessary physical restrictions and alterations undertaken to mitigate further property loss and damage.

40.     Notably, Plaintiff's Policy does not contain any exclusion which would apply to allow Defendant to completely deny coverage for losses caused by the coronavirus, necessary physical alterations to its property and related actions of civil authorities.

### *The Virus Coverage Endorsement in the Policy*

41.     The presence of virus or disease can constitute physical damage to property, as the insurance industry has recognized since at least 2006. When preparing so-called "virus" exclusions to be placed in some policies, but not others, the insurance industry's drafting arm, the Insurance Services Office (ISO), which works in conjunction with Hartford, circulated a statement to insurers and state insurance regulators that included the following:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

42.     Despite recognizing that the spread of a virus such as the coronavirus could constitute "business interruption (time element) losses," or "actual property damage," and despite incorporating ISO forms and language in various parts of the Policy, Defendant Hartford elected not to include the ISO's standard "virus" exclusion in Plaintiff's policy.

43.     Instead, Hartford included a specific "virus" inclusion provision: The Virus Coverage Endorsement.

44.     The Policy incorporates Hartford's "Limited Fungi, Bacteria or Virus Coverage" endorsement (the "Virus Coverage Endorsement"), which applies to the Special Property Coverage Form.

45.     The Virus Coverage Endorsement provides limited coverage for losses caused by fungi, wet rot, dry rot, bacteria, and virus.

46.     The Virus Coverage Endorsement states, with respect to the Special Property Coverage Form's Time Element Coverages, that if a suspension of operations is "necessary due to loss or damage to property caused by . . . virus," then Hartford's payment under the Time Element Coverage is limited to the amount of loss and expense sustained during a period of thirty days or the number of days indicated in the policy's declarations.

47.     To the extent that Defendant contends that this coverage does not apply based on vague or internally inconsistent language elsewhere in the Virus Coverage Endorsement, this argument must be rejected—and has already been rejected by courts.  Under Florida law, ambiguous policy provisions are interpreted strictly against the insurer, and insurance policies cannot be construed such as to render a policy's grant of coverage illusory.  *See*, *e.g.*, *Urogynecology Specialist of Florida LLC v. Sentinel Ins. Co.*, No. 20-cv-1174, 2020 WL 5939172

(M.D. Fla. Sep. 24, 2020); *Dickson v. Econ. Premier Assur. Co.*, 36 So. 3d 789, 790 (Fla. Dist. Ct. App. 2010); *First Mercury Ins. Co. v. Sudderth*, 620 Fed. App'x 826, 830 (11th Cir. 2015).

48.     Accordingly, because the Policy is an all-risk policy, does not exclude the losses that Plaintiff has suffered, and expressly and affirmatively provides certain coverages for loss or damage by virus, Plaintiff's losses are covered up to the applicable limit(s) of insurance.

**_The coronavirus and its impact on property_**

49.     The coronavirus has spread quickly throughout the United States and much of the world, and it remains widespread throughout the country.  The United States has had over thirty million coronavirus infections, and presently averages at least fifty thousand new infections per day.

50.     Anyone infected with the coronavirus, including those not showing symptoms and those who have not been tested, may unknowingly spread the virus to others by expelling tiny respiratory droplets when speaking, coughing, exhaling, or sneezing.  These droplets can then attach to surfaces or linger and travel in the air.  The CDC has estimated that approximately 40% of people infected with the coronavirus are asymptomatic and have unknowingly left the virus in places they have visited. The CDC reports that these people have contributed to the virus's spread, and that the rate of infection is much higher than reported.[4]

51.     The persistently high number of infections nationally and locally underscores several basic facts about the coronavirus: it is physically pervasive; it exists in humans, in the air, on surfaces and on objects; it remains highly contagious in air and on surfaces for hours and up to

---

[4]      *See* Erika Edwards, *CDC says COVID-19 cases in U.S. may be 10 times higher than reported*, NBC News (June 25,2020) (https://www.nbcnews.com/health/health-news/cdc-says-covid-19-cases-u-s-may-be-10-n1232134); Ellen Cranley, *40% of people infected with COVID-19 are asymptomatic, a new CDC estimate says*, Business Insider (Jul 12, 2020) (https://www.businessinsider.com/cdc-estimate-40-percent-infected-with-covid-19-asymptomatic-2020-7).

several days; and there is no readily available mechanism to permanently or reliably eliminate coronavirus contamination in occupied spaces.

52.     According to scientific research, the two main mechanisms for coronavirus contamination of people and property are airborne contamination and contamination through surfaces.  When a person infected with the coronavirus expels particles and droplets containing the virus, the virus can then be directly inhaled by others, linger in the air and risk inhalation at a later point in time, or land on and attach to surfaces where it can come into contact with others who touch those surfaces.

53.     The coronavirus is active and transmissible in airborne particles of various sizes, from larger respiratory droplets to microscopic "aerosols."  Respiratory droplets can travel short and medium distances.  Smaller coronavirus-carrying aerosols can float through the air and accumulate over time.[5]  These tiny viral particles can linger in the air for hours, invading heating and air ventilation systems where they remain in circulation for longer periods of time.[6]  Experts thus have suggested that business property owners upgrade HVAC systems to limit the circulation of viral particles that may exist within the system.[7]

54.     Coronavirus-carrying aerosols are most likely to accumulate in confined indoor spaces, including retail locations like restaurants and beauty salons.

---

[5]     *See* Dyani Lewis, *Mounting evidence suggests coronavirus is airborne—but health advice has not caught up*, NATURE (July 8, 2020), *available at* https://www.nature.com/articles/d41586-020-02058-1#:~:text=Converging%20lines%20of%20evidence%20indicate,air%20and%20accumulate%20over%20time.

[6]     Neeltje van Doremalen, *et al.*, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, N. ENGL. J. MED. (Mar. 17, 2020), available at https://www.nejm.org/doi/full/10.1056/NEJMc2004973.

[7]     Zeynep Tufeckci, *We Need to Talk About Ventilation*, THE ATLANTIC, July 30, 2020, available at https://www.theatlantic.com/health/archive/2020/07/why-arent-we-talking-more-aboutairbornetransmission/614737/.

55.    In addition to airborne and aerosol-based contamination, the coronavirus also contaminates surfaces by attaching to them.  The virus can remain active on surfaces for up to several days or even weeks.[8]  As with aerosol contamination, the contamination of surfaces is also most likely in confined indoor spaces.  Objects and surfaces that are contaminated with the coronavirus are sometimes referred to as "fomites."[9]

56.    As reported by *The New England Journal of Medicine*, the coronavirus remains detectable in the air for up to three hours, on copper for up to four hours, on carboard for up to twenty-four hours, and on plastic and stainless steel for up to three days.[10] Other scientific sources report that the coronavirus may remain on polystyrene plastic, aluminum and glass for as long as eight days, and can remain infectious on surfaces and objects at normal room temperatures for up to nine days.[11]

57.    Like many businesses, Plaintiff's property contains various surfaces and equipment made of plastic, glass, and other materials on which the virus can remain active for long periods of time.  Plaintiff also uses glass, plastic and metal equipment as part of its business of providing beauty services.  Plaintiff's property therefore became an incubator for the coronavirus, as a

---

[8]    *See Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, Vol. 104, Kemp., G., et al., Journal of Hospital Infection, No. 3, March 2020, pages 246-251 (remains infectious from 2 hours to 28 days depending on conditions); see also https://www.ucsf.edu/news/2020/02/416671/how-new-coronavirus-spreads-and-progresses-and-why-one-test-may-not-be-enough (doorknobs and table tops can contain the virus); https://www.nytimes.com/2020/03/02/health/coronavirus-how-it-spreads.html (virus can remain on metal, glass and plastic for several days).

[9]    *See, e.g.*, Boris Pastorino et al., *Prolonged Infectivity of SARS-CoV-2 in Fomites*, CDC RESEARCH LETTER (Sept. 2020), *available at* https://wwwnc.cdc.gov/eid/article/26/9/20-1788_article.

[10]    Neeltje van Doremalen, *et al.*, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, N. ENGL. J. MED. (Mar. 17, 2020), available at https://www.nejm.org/doi/full/10.1056/NEJMc2004973.

[11]    Boris Pastorino, *et al.*, *Prolonged Infectivity of SARS-CoV-2 in Fomites*, 26 Emerging Infectious Diseases 9 (Sept. 2020) (https://wwwnc.cdc.gov/eid/article/26/9/20-1788_article).

business whose very nature requires frequent customer traffic and close physical engagement between customers and staff.

58.     At present, there are no known mechanisms for completely or permanently eliminating coronavirus contamination in occupied indoor spaces.  Cleaning and disinfecting are, at best, temporary and short-lived solutions.  So long as a property is occupied, there is a constant risk of recontamination of air and surfaces.

59.     With respect to surface contamination and fomites, indoor spaces are likely continuously re-contaminated so long as they remain occupied.  Accordingly, the application of liquid cleaning agents to surfaces is only a temporary and partial solution.  With respect to aerosols, the only known mechanisms for mitigating the accumulation of coronavirus-carrying aerosols in indoor spaces are to increase ventilation or install expensive equipment for filtering air.  And even these solutions do not completely eliminate the risk of coronavirus contamination.

60.     In short, permanently and reliably eliminating coronavirus contamination of property is presently impossible for occupied indoor spaces.  Plaintiff's only options are and have been (a) to contain and mitigate the contamination through physical alterations that necessarily lead to a slowdown in business; or (b) to shut down entirely.  The alternative—to continue its business unabated and without physical alterations—would not only risk the safety of Plaintiff's staff, Plaintiff's customers, and the general public, but it would also expose the property to a near-certain risk of widespread and unmitigated physical contamination by the coronavirus.

61.     The coronavirus, its omnipresence in Miami-Dade County, and the constant risk of widespread contamination and recontamination have altered Patrice Bourgier's property from a once satisfactory state to a current unsatisfactory and highly dangerous state for providing beauty services.  The coronavirus physically changed the condition of Plaintiff's property from usable

and inhabitable to unusable, uninhabitable, unfit for its intended purpose of beauty services, and dangerous and unsafe for human occupation due to the ability of the coronavirus to physically attach to and survive on surfaces within the property; travel through the ventilation system; accumulate in the air; and make contact with people, including employees and patrons, who are on the premises.

62.     The physical alteration of Plaintiff's insured property from a satisfactory state to an unsatisfactory and physically harmful state has forced and will continue to force Plaintiff and other businesses to make substantial physical changes to their properties.  These changes include but are not limited to the reconfiguration of seating, the installation of plexiglass shields and additional sanitizer dispensers, the enhancement of air filtration systems in response to the threat of transmission of the coronavirus from those coming in and out of the property, and the more frequent replacement of equipment due to the increased rate of deterioration from increased cleaning.  To the extent that Defendant's policies may arguably be interpreted to require a structural alteration to Plaintiff's property in order to trigger coverage—an interpretation that would be inconsistent with the law of Florida and other states—such alteration has indeed occurred.

63.     The insurance industry itself has also acknowledged that viruses physically alter insured property.  In 2006, the ISO not only explained that a specific virus exclusion was necessary to exclude pandemic-related risks from all-risk policies.  It also explained that "[d]isease-causing agents may render a product impure or enable the spread of disease *by the presence on the interior building surfaces or surfaces of personal property*."[12]

***Plaintiff's covered losses***

---

[12]     Insurance Services Office, Inc., Circular, LI-CF-2006-175, July 6, 2006.

64.     Like many areas of the country, Miami-Dade County, where the Patrice Bourgier salon is located, suffers from widespread coronavirus contamination and infection.[13]  As a result, the coronavirus has undoubtedly been physically present on Plaintiff's property, before and after the danger of contracting the coronavirus became known to the public.  Equally important, the omnipresence of the virus, and the constant risk of contamination and re-contamination by the virus, have made it impossible for Plaintiff to continue normal operations at the salon.  Absent severe and drastic physical alterations to the Patrice Bourgier property, it would be impossible to reliably avoid or eliminate the presence of the virus on the property.

65.     The widespread presence of the coronavirus prompted actions by civil authorities throughout the United States ("Civil Authority Actions"), including but not limited to civil authorities with jurisdiction over the Patrice Bourgier salon: the City of Miami, Miami-Dade County, and the state of Florida.  These Civil Authority Actions have restricted and prohibited access to the insured property as a direct result of a Covered Cause of Loss to property in the immediate area of Plaintiff's premises.

66.     Throughout March and April 2020, the City of Miami issued and extended several Emergency Orders that ordered all City residents to remain home with certain exceptions, and closed all non-essential retail and commercial establishments, including but not limited to beauty salons.

67.     On March 19, 2020, Miami-Dade County issued Emergency Order 07-20, requiring the closure of all non-essential businesses, including but not limited to beauty salons.

---

[13]     *See* COVID-19 United States Cases by County, Johns Hopkins University of Medicine Coronavirus Resource Center, available at  https://coronavirus.jhu.edu/us-map (last visited Mar. 17, 2021).

68.     On March 30, 2020, the Governor of Florida signed Executive Order 20-89, ordering Miami-Dade County, among other counties, "to restrict public access" to non-essential businesses.

69.     In Florida, violations of an executive order issued by the Governor pursuant to the State Emergency Management Act are second-degree misdemeanors punishable by imprisonment.

70.     The presence of the coronavirus caused direct physical loss of and/or damage to the covered premises under the Policy in several respects:

    a.  First, the novel coronavirus physically contaminated the air in and surfaces on Plaintiff's property, thereby eliminating, impairing, or limiting the use of that property.  Although Plaintiff has undertaken diligent efforts—at Plaintiff's own significant expense—to mitigate, prevent, contain and reduce this contamination, Plaintiff has been unable to permanently or reliably end the contamination, because of the constant threat of recontamination of surfaces on and air in Plaintiff's property.  In short, the actual and imminent contamination and recontamination of Plaintiff's property have physically transformed and altered the property from a satisfactory to an unsatisfactory and unsafe state.

    b.  Second, the actual and imminent physical contamination of Plaintiff's property forced Plaintiff to make necessary loss-mitigating physical alterations to its property.  These alterations have including but are not limited to altering the physical layout of its property and reducing the occupancy of its property.

    c. Third, the actual and imminent physical contamination of Plaintiff's property caused all or part of the property to be physically uninhabitable by customers at various periods between March of 2020 and the date of filing of this Complaint.

    d. Fourth, the actual and imminent physical contamination of Plaintiff's property caused the property's physical function to be nearly eliminated, destroyed, and/or severely limited.

71. At all times material to this action, demand for the Patrice Bourgier salon's services has remained healthy. Therefore, to the extent that Patrice Bourgier has lost business income and suffered a slowdown in business since March 2020, it is because of the above-described physical loss of and damage to its property.

72. In other words, Plaintiff has lost business income *not* primarily because of a downturn in demand of a deterioration in market conditions, but instead because of the coronavirus, its actual and imminent physical contamination of the property, and necessary physical alterations to contain and mitigate this contamination. In short, Patrice Bourgier's losses are tethered to the direct physical loss and physical damage to its property.

73. Although some of the contamination of the property can be partly mitigated by decontamination protocols, this has not eliminated or fully mitigated Plaintiff's covered losses for several reasons.

    a. First, given the constant threat of recurring and repeated contamination, cleaning protocols alone are insufficient to completely, reliably, and permanently eliminate the contamination.

b.  Second and relatedly, Plaintiff has been forced to make necessary physical alterations to its property—in addition to decontamination protocols—that have caused a loss of business income.  For example, in an effort to contain and mitigate contamination by the coronavirus, Plaintiff has physically reconfigured its property and reduced the property's occupancy.

c.  Third, Plaintiff's cleaning protocols have themselves led to property loss and damage, as the use of harsher cleaning agents necessary to temporarily decontaminate surfaces exposed to the coronavirus have led those surfaces to deteriorate more rapidly.

74.  Therefore, although Plaintiff has sought to mitigate its business income losses, it has been unable to avoid or eliminate the suspension of business operations at its premises. Plaintiff is and has been unable to permanently or reliably eliminate or avoid coronavirus contamination of its property so long as it continues to operate its business at all.  The constant risk of recontamination is particularly acute because Plaintiff's business is a beauty salon which requires employees to make close contact with their clients.

75.  The Civil Authority Actions prohibiting public access to the covered premises and the surrounding area were issued in response to dangerous physical conditions in the vicinity of the Patrice Bourgier salon and caused a suspension of business operations on the covered premises.

76.  As a result of the coronavirus, Patrice Bourgier has suffered a suspension of business operations, sustained losses of business income, and incurred extra expenses.

77.  As a result of the Civil Authority Actions, Patrice Bourgier has suffered a suspension of business operations, sustained losses of business income, and incurred extra expenses.

78.     These losses and expenses have continued through the date of filing of this action.

79.     These losses and expenses are not excluded from coverage under the Policy.  And because the Policy is an all-risk policy, and Plaintiff has complied with its contractual obligations, Plaintiff is entitled to payment for these losses and expenses.

80.     These losses and expenses are also expressly covered pursuant to the Policy's Virus Coverage Endorsement.

81.     Accordingly, Plaintiff provided notice of its losses and expenses to Defendant, consistent with the terms and procedures of the Policy.

82.     But contrary to the plain language of the Policy, and to Defendant's corresponding promises and contractual obligations, Defendant has refused to pay for Plaintiff's losses and expenses.

## CLASS ACTION ALLEGATIONS

83.     The class claims all derive directly from a single course of conduct by Defendant: its systematic and uniform refusal to pay insureds for losses suffered due to the coronavirus and the related actions taken by civil authorities.

84.     Plaintiff brings this action pursuant to Rules 23(a), 23(b)(1), 23(b)(2), and/or 23(b)(3), as well as 23(c)(4), of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

85.     Plaintiff seeks to represent nationwide classes defined as:

a)      All persons and entities with Business Income coverage under a property insurance policy issued by Defendant, which suffered a suspension of business due to the coronavirus, and for which Defendant has denied a claim for the losses or have otherwise

failed to acknowledge, accept as a covered loss, or pay for the covered losses ("the Business Income Coverage Class").

b)      All persons and entities with Civil Authority coverage under a property insurance policy issued by Defendant, which suffered loss of Business Income and/or Extra Expense caused by an action of a civil authority, and for which Defendant has denied a claim for the losses or has otherwise failed to acknowledge, accept as a covered loss, or pay for the covered losses ("the Civil Authority Coverage Class").

c)      All persons and entities with Extra Expense coverage under a property insurance policy issued by Defendant, which sought to avoid or minimize the suspension of business caused by the coronavirus and/or the actions of civil authorities in response to the coronavirus, and for which Defendant has denied a claim for the expenses or has otherwise failed to acknowledge, accept as a covered expense, or pay for the covered expenses ("the Extra Expense Coverage Class").

d)      All persons and entities with a Virus Coverage Endorsement under a property insurance policy issued by Defendant, which suffered a suspension of business and sought to avoid or minimize the suspension of business caused by the coronavirus and/or the actions of civil authorities in response to the coronavirus, and for which Defendant has denied a claim for the losses and expenses or has otherwise failed to acknowledge, accept as a covered expense, or pay for the covered expenses the Time Element losses suffered ("the Virus Coverage Endorsement Coverage Class").

86.    Excluded from each defined proposed Class are Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns;

governmental entities; Class Counsel and their employees; and the judicial officers and Court staff assigned to this case and their immediate family members.

87.     Plaintiff reserves the right to modify, expand, or amend the definitions of the proposed Classes, as appropriate, during the course of this litigation.

88.     This action has been brought and may properly be maintained on behalf of each Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

**Numerosity and Ascertainability**

89.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).  The members of each proposed Class are so numerous that individual joinder of all Class members is impracticable.  There are, at a minimum, thousands of members of each proposed Class, and these individuals and entities are spread out across the country.

90.     The identity of Class members is ascertainable, as the names and addresses of all Class members can be identified in Defendant's or its agents' books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

**Predominance of Common Issues**

91.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because this action involves common questions of law and fact which predominate over any questions affecting only individual Class members.  Defendant issued all-risk policies to all the members of each proposed Class in exchange for payment of premiums by the Class members.  The questions of law and fact affecting all Class members include, without limitation, the following:

a)      Whether Plaintiff and the Class members suffered a covered loss under the common policies issued to members of the Class;

b)      Whether Defendant wrongfully denied all claims related to the coronavirus;

c)      Whether Defendant's Business Income coverage applies to a suspension of business caused by the coronavirus and/or related actions of civil authorities taken in response to the presence or threat of the coronavirus;

e)      Whether Defendant's Civil Authority coverage applies to a loss of Business Income caused by the orders of local, municipal, city, county, and/or state governmental entities requiring the suspension of business during the outbreak of the coronavirus in the United States;

f)      Whether Defendant's Extra Expense coverage applies to efforts to avoid or minimize a loss caused by the coronavirus;

g)      Whether Defendant's Virus Coverage Endorsement coverage applies to losses caused by the coronavirus;

h)      Whether Defendant has breached its contracts of insurance through a uniform and blanket denial of all claims for business losses related to the coronavirus and/or the related actions of civil authorities taken in response to the presence or threat of the coronavirus;

i)      Whether Plaintiff and the Class members suffered damages as a result of Defendant's actions; and

j)      Whether Plaintiff and the Class members are entitled to an award of reasonable attorneys' fees, interest, and costs.

**<u>Typicality</u>**

92.      This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiff's claims are typical of the claims of the Class members and arise from the same course of conduct by Defendant. Plaintiff and the other Class members are all similarly affected by Defendant's

refusal to pay under their property insurance policies.  Plaintiff's claims are based upon the same legal theories as those of the other Class members.  Plaintiff and the other Class members sustained damages as a direct and proximate result of the same wrongful practices in which Defendant engaged.  The relief Plaintiff seeks is typical of the relief sought for the absent Class members.

**Adequacy of Representation**

93.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(4) because Plaintiff will fairly and adequately represent and protect the interests of Class members.  Plaintiff has retained counsel with substantial experience in prosecuting complex class action litigation.

94.     Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of the Class members and have the financial resources to do so.  Neither Plaintiff nor its counsel has interests adverse to those of the Class members.

**Inconsistent or Varying Adjudications and the Risk of Impediments to Other Class Members' Interests**

95.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(1).  Plaintiff seeks class-wide adjudication as to the interpretation and scope of Defendant's property insurance policies.  The prosecution of separate actions by individual members of the proposed Classes would create an imminent risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant.

**Final Injunctive and/or Corresponding Declaratory Relief with respect to the Class is Appropriate**

96.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendant acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to the Class members.  The class claims all derive directly from Defendant's systematic and uniform refusal to pay insureds for losses suffered due to the coronavirus and the related actions

taken by civil authorities to suspend business operations.  Defendant's actions or refusal to act are grounded upon the same generally applicable legal theories.

**<u>Superiority</u>**

97.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The common questions of law and of fact regarding Defendant's conduct and the interpretation of the common language in their property insurance policies predominate over any questions affecting only individual Class members.

98.     Because the damages suffered by certain individual Class members may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for all individual Class members to redress the wrongs done to each of them individually, such that many Class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

99.     The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation.  Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the Court, and the public of class treatment in this Court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

100.     Plaintiff is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.   The Court may, on motion of Plaintiff or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

## CAUSES OF ACTION

### COUNT I: DECLARATORY JUDGMENT
**(On behalf of the Business Income Coverage Class)**

101.     Plaintiff re-adopts and re-alleges paragraphs 1 through 100 above.

102.     Plaintiff brings this Count individually and on behalf of the other members of the Business Income Coverage Class.

103.     Under 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights and other legal relations of the parties in dispute.

104.     Plaintiff's Policy, as well as the policies of other Business Income Coverage Class members, are insurance contracts under which Defendant was paid premiums in exchange for promises to pay Class members' losses for claims covered by the Policy.

105.     In the Policy, Defendant promised to pay for losses of business income sustained as a result of perils not excluded under the Policy.  Specifically, Defendant promised to pay for losses of business income sustained as a result of a suspension of business operations during the Period of Restoration.

106.    The coronavirus caused direct physical loss of and damage to Patrice Bourgier and other Class members' insured premises, resulting in suspensions of business operations at these premises.  These suspensions have caused Plaintiff and Class members to suffer losses of business income.

107.    These suspensions and losses triggered business income coverage under the Policy and other Class members' policies.

108.    Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

109.    Defendant, without justification, disputes that the Policy and other Class members' policies provide coverage for these losses.

110.    Plaintiff seeks a Declaratory Judgment that its Policy and other Class members' policies provide coverage for the losses of business income.

111.    An actual case or controversy exists regarding Plaintiff's and other Class members' rights and Defendant's obligations to reimburse Plaintiff and other Class members for the full amount of these losses. Accordingly, the Declaratory Judgment sought is justiciable.

WHEREFORE, Plaintiff requests that this Court enter a Declaratory Judgment declaring that the Policy and other Class members' policies provide coverage for Class members' losses of business income.

## COUNT II: BREACH OF CONTRACT
### (On behalf of the Business Income Coverage Class)

112.    Plaintiff re-adopts and re-alleges paragraphs 1 through 100 above.

113.    Plaintiff brings this Count individually and on behalf of the other members of the Business Income Coverage Class.

114. Plaintiff's Policy, as well as the policies of other Business Income Coverage Class members, are insurance contracts under which Defendant was paid premiums in exchange for promises to pay Class members' losses for claims covered by the Policy.

115. In the Policy, Defendant promised to pay for losses of business income sustained as a result of perils not excluded under the Policy. Specifically, Defendant promised to pay for losses of business income sustained as a result of a suspension of business operations during the Period of Restoration.

116. The coronavirus caused direct physical loss of and damage Patrice Bourgier and other Class members' insured premises, resulting in suspensions of business operations at these premises. These suspensions have caused Class members to suffer losses of business income.

117. These suspensions and losses triggered business income coverage under the Policy and other Class members' policies.

118. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

119. Defendant, without justification, have refused performance under the Policy and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendant is in breach of the Policy and other Class members' policies.

120. As a result of Defendant's breaches of the Policy and other Class members' policies, Plaintiff and other Class members have suffered actual and substantial damages for which Defendant is liable.

WHEREFORE, Plaintiff, individually and on behalf of other Class members, seeks compensatory damages resulting from Defendant's breaches of the Policy and other Class

Members' policies and seek all other relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT III: DECLARATORY JUDGMENT
### (On behalf of the Extra Expense Coverage Class)

121.    Plaintiff re-adopts and re-alleges paragraphs 1 through 100 above.

122.    Plaintiff brings this Count individually and on behalf of the other members of the Extra Expense Coverage Class.

123.    Under 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights and other legal relations of the parties in dispute.

124.    Plaintiff's Policy, as well as the policies of other Extra Expense Coverage Class members, are insurance contracts under which Defendant was paid premiums in exchange for promises to pay Class members' losses for claims covered by the Policy.

125.    Specifically, Defendant promised to pay for Extra Expenses incurred by Plaintiff and other Class members during the Period of Restoration that the insureds would not have incurred if there had been no loss or damage to the insured premises.  These Extra Expenses include expenses to avoid or minimize the suspension of business, continue operations, and to repair or replace property.

126.    The coronavirus caused direct physical loss of and damage to Patrice Bourgier and other Class members' insured premises, resulting in suspensions of business operations at these premises.  As a result, Plaintiff and other Class members have incurred Extra Expenses.

127.    These Expenses triggered Extra Expense coverage under the Policy and other Class members' policies.

128.    Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

129.    Defendant, without justification, disputes that the Policy and other Class members' policies provide coverage for these Extra Expenses.

130.    Plaintiff, individually and on behalf of the other members of the Extra Expense Coverage Class, seeks a Declaratory Judgment that its Policy, and those of other members of the Extra Expense Coverage Class, provides coverage for these Extra Expenses.

131.    An actual case or controversy exists regarding Class members' rights and Defendant's obligations under Class members' policies to reimburse Class members for these Extra Expenses. Accordingly, the Declaratory Judgment sought is justiciable.

WHEREFORE, Plaintiff requests that this Court enter a Declaratory Judgment declaring that the Policy and other Class members' policies provide coverage for Class members' Extra Expenses.

## COUNT IV: BREACH OF CONTRACT
### (On behalf of the Extra Expense Coverage Class)

132.    Plaintiff re-adopts and re-alleges paragraphs 1 through 100 above.

133.    Plaintiff brings this Count individually and on behalf of the other members of the Extra Expense Coverage Class.

134.    Plaintiff's Policy, as well as the policies of other Extra Expense Coverage Class members, are insurance contracts under which Defendant was paid premiums in exchange for promises to pay Class members' losses for claims covered by the Policy.

135.    Specifically, Defendant promised to pay for Extra Expenses incurred by Plaintiff and other Class members during the Period of Restoration that the insureds would not have incurred if there had been no loss or damage to the insured premises.  These Extra Expenses include expenses to avoid or minimize the suspension of business, continue operations, and to repair or replace property.

136.    The coronavirus caused direct physical loss of and damage to Patrice Bourgier and other Class members' insured premises, resulting in suspensions of business operations at these premises.  These suspensions have caused Class members to incur Extra Expenses.

137.    These Expenses triggered Extra Expense coverage under the Policy and other Class members' policies.

138.    Plaintiff and the other Class members have complied with all applicable provisions of the Policy, including payment of premiums.

139.    Defendant, without justification, have refused performance under the Policy and other Class members' policies by denying coverage for these Extra Expenses.  Accordingly, Defendant is in breach of the Policy and other Class members' policies.

140.    As a result of Defendant's breaches of the Policy and other Class members' policies, Plaintiff and other Class members have suffered actual and substantial damages for which Defendant is liable.

WHEREFORE, Plaintiff, individually and on behalf of other Class members, seeks compensatory damages resulting from Defendant's breaches of the Policy and other Class Members' policies and seek all other relief deemed appropriate by this Court, including attorneys' fees and costs.

### COUNT V: DECLARATORY JUDGMENT
#### (On behalf of the Civil Authority Coverage Class)

141.    Plaintiff re-adopts and re-alleges paragraphs 1 through 100 above.

142.    Plaintiff brings this Count individually and on behalf of the other members of the Civil Authority Coverage Class.

143.    Under 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights and other legal relations of the parties in dispute.

144.    Plaintiff's Policy, as well as the policies of other Civil Authority Coverage Class members, are insurance contracts under which Defendant was paid premiums in exchange for promises to pay Class members' losses for claims covered by the policies.

145.    In the Policy and other Class members' policies, Defendant promised to pay for losses of business income sustained and extra expenses incurred when, among other things, a Covered Cause of Loss causes damage to property near the insured premises, the civil authority prohibits access to property near the insured premises, and the civil authority action is taken in response to dangerous physical conditions.

146.    Plaintiff and other Class members have suffered losses and incurred expenses as a result of actions of civil authorities that prohibited access to insured premises under the Policy and Class members' policies.

147.    These losses satisfied all requirements to trigger Civil Authority coverage under the Policy and other Class members' policies.

148.    Plaintiff and the other Class members have complied with all applicable provisions of the Policy, including payment of premiums.

149.    Defendant, without justification, disputes that the Policy provides coverage for these losses.

150.    Plaintiff seeks a Declaratory Judgment that its Policy and other Class members' policies provide coverage for the losses that Class members have sustained and extra expenses they have incurred caused by actions of civil authorities.

151.    An actual case or controversy exists regarding Class members' rights and Defendant's obligations under Class members' policies to reimburse Class members for these losses and extra expenses. Accordingly, the Declaratory Judgment sought is justiciable.

WHEREFORE, Plaintiff, individually and on behalf of other Class members, requests that this Court enter a Declaratory Judgment declaring that the Policy provides Civil Authority coverage for the losses and extra expenses incurred by Plaintiff and the other Class members.

## COUNT VI: BREACH OF CONTRACT
### (On behalf of the Civil Authority Coverage Class)

152.    Plaintiff re-adopts and re-alleges paragraphs 1 through 100 above.

153.    Plaintiff brings this Count individually and on behalf of the other members of the Civil Authority Coverage Class.

154.    Plaintiff's Policy, as well as the policies of other Civil Authority Coverage Class members, are insurance contracts under which Defendant was paid premiums in exchange for promises to pay Class members' losses and expenses covered by the Policy.

155.    In the Policy and other Class members' policies, Defendant promised to pay for losses of business income sustained and extra expenses incurred when a Covered Cause of Loss causes damage to property near the insured premises, the civil authority prohibits access to property near the insured premises, and the civil authority action is taken in response to dangerous physical conditions.

156.    Plaintiff and other Class members have suffered losses and incurred expenses as a result of actions of civil authorities that prohibited access to insured premises under the Policy and Class members' policies.

157.    These losses satisfied all requirements to trigger Civil Authority coverage under the Policy and other Class members' policies.

158.    Plaintiff and the other Class members have complied with all applicable provisions of the Policy, including payment of premiums.

159.    Defendant, without justification, have refused performance under the Policy and other Class members' policies by denying coverage for these losses and expenses.  Accordingly, Defendant is in breach of the Policy and other Class members' policies.

160.    As a result of Defendant's breaches of the Policy and other Class members' policies, Plaintiff and other Class members have suffered actual and substantial damages for which Defendant is liable.

WHEREFORE, Plaintiff seeks compensatory damages resulting from Defendant's breaches of the Policy and other Class members' policies and seek all other relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT VII: DECLARATORY JUDGMENT
### (On behalf of the Virus Coverage Endorsement Coverage Class)

161.    Plaintiff re-adopts and re-alleges paragraphs 1 through 100 above.

162.    Plaintiff brings this Count individually and on behalf of the other members of the Virus Coverage Endorsement Coverage Class.

163.    Under 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights and other legal relations of the parties in dispute.

164.    Plaintiff's Policy, as well as the policies of other Virus Coverage Endorsement Coverage Class members, are insurance contracts under which Defendant was paid premiums in exchange for promises to pay Class members' losses for claims covered by the policies.

165.    Hartford's Special Property Coverage Form provides various "Time Element Coverages," including "Business Income" coverage, "Civil Authority" coverage, and "Extra Expense" coverage.

166.    The Special Property Coverage Form's "Business Income" coverage promises to pay for loss due to the necessary suspension of operations following physical loss of or damage to the insured premises.

167.    The Special Property Coverage Form's "Civil Authority" coverage promises to pay for loss caused by the action of a civil authority that prohibits access to the insured premises because of damage to property in the immediate area of the insured premises.

168.    The Special Property Coverage Form's "Extra Expense" coverage promises to pay the expense incurred to minimize the suspension of business and to continue operations.

169.    The Policy also incorporates Hartford's "Limited Fungi, Bacteria or Virus Coverage" endorsement (the "Virus Coverage Endorsement"), which applies to the Special Property Coverage Form.

170.    The Virus Coverage Endorsement provides limited coverage for losses caused by virus.

171.    The Virus Coverage Endorsement states, with respect to the Special Property Coverage Form's Time Element Coverages, that if a suspension of operations is "necessary due to loss or damage to property caused by . . . virus," then Hartford's payment under the Time Element Coverage is limited to the amount of loss and expense sustained during a period of thirty days or the number of days indicated in the policy's declarations.

172.    Plaintiff was forced to suspend business due to the coronavirus and the resultant closure orders issued by civil authorities in Florida.

173.    Plaintiff and other Class members have suffered losses and incurred expenses as a result of losses that fall within the coverage provided by the Virus Coverage Endorsement and related Time Element Coverages.

174.    These losses satisfied all requirements to trigger Virus Coverage Endorsement coverage under the Policy and other Class members' policies.

175.    Plaintiff and the other Class members have complied with all applicable provisions of the Policy, including payment of premiums.

176.    Defendant, without justification, disputes that the Policy provides coverage for these losses.

177.    Plaintiff seeks a Declaratory Judgment that its Policy and other Class members' policies provide coverage for the Time Element losses that Class members have sustained which are covered by the Virus Coverage Endorsement.

178.    An actual case or controversy exists regarding Class members' rights and Defendant's obligations under Class members' policies to reimburse Class members for these losses and extra expenses. Accordingly, the Declaratory Judgment sought is justiciable.

WHEREFORE, Plaintiff, individually and on behalf of other Class members, requests that this Court enter a Declaratory Judgment declaring that the Policy provides Virus Coverage Endorsement coverage for the losses and extra expenses incurred by Plaintiff and the other Class members.

## COUNT VIII: BREACH OF CONTRACT
### (On behalf of the Virus Coverage Endorsement Coverage Class)

179.    Plaintiff re-adopts and re-alleges paragraphs 1 through 100 above.

180.    Plaintiff brings this Count individually and on behalf of the other members of the Virus Coverage Endorsement Coverage Class.

181.    Plaintiff's Policy, as well as the policies of other Virus Coverage Endorsement Coverage Class members, are insurance contracts under which Defendant was paid premiums in exchange for promises to pay Class members' losses and expenses covered by the Policy.

182.     In the Policy and other Class members' policies, Defendant promised to pay for losses of business income sustained and extra expenses incurred when a Covered Cause of Loss causes damage resulting in losses covered by the Time Element provisions of the Policy.

183.     Plaintiff and other Class members have suffered losses and incurred expenses as a result of the presence of the coronavirus upon its premises and in the vicinity as necessary to provide coverage under the Virus Coverage Endorsement and Time Element coverages of the policy.

184.     These losses satisfied all requirements to trigger Virus Coverage Endorsement coverage under the Policy and other Class members' policies.

185.     Plaintiff and the other Class members have complied with all applicable provisions of the Policy, including payment of premiums.

186.     Defendant, without justification, has refused performance under the Policy and other Class members' policies by denying coverage for these losses and expenses.  Accordingly, Defendant in in breach of the Policy and other Class members' policies.

187.     As a result of Defendant's breaches of the Policy and other Class members' policies, Plaintiff and other Class members have suffered actual and substantial damages for which Defendant is liable.

WHEREFORE, Plaintiff seeks compensatory damages resulting from Defendant's breaches of the Policy and other Class members' policies and seek all other relief deemed appropriate by this Court, including attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendant, as follows:

A.      Entering an order certifying the proposed nationwide Classes, designating Plaintiff as Class representative, and appointing Plaintiff's undersigned attorneys as Counsel for the classes;

B.      Entering declaratory judgments on Counts I, III, V and VII in favor of Plaintiff and the members of the Business Income Coverage Class, Civil Authority Coverage Class, Extra Expense Coverage Class, and Virus Coverage Endorsement Class as follows:

    i.  Business Income, Civil Authority and Extra Expense losses and expenses incurred and sustained as a result of the coronavirus and related civil authority actions are insured and covered losses and expenses under Plaintiff's and Class members' policies; and

    ii. Defendant is obligated to pay for the full amount of the Time Element, Business Income, Civil Authority and Extra Expense losses and expenses sustained and incurred, and to be sustained and incurred, as a result of the coronavirus and related civil authority actions are insured and covered losses and expenses under Plaintiff and Class members' policies;

C.      Entering judgments on counts II, IV, VI and VIII in favor of Plaintiff and the members of the Business Income Coverage Class, Civil Authority Coverage Class, Extra Expense Coverage Class, and Virus Coverage Endorsement Class; and awarding damages for breach of contract in an amount to be determined at trial;

D.      An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

E.      An award of costs and attorneys' fees; and

F.      Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

The undersigned hereby demands a trial by jury as to all issues so triable.

Dated: March 18, 2021

**PODHURST ORSECK, P.A.**

 /s/ Steven C. Marks
Steven C. Marks (Fla. Bar. No. 516414)
Aaron S. Podhurst (Fla. Bar. No. 63606)
Lea P. Bucciero (Fla. Bar. No. 84763)
Kristina M. Infante (Fla. Bar. No. 112557)
Pablo Rojas (Fla. Bar. No. 1022427)
SunTrust International Center
One Southeast 3rd Ave, Suite 2300
Miami, Florida 33131
Phone: (305) 358-2800
Fax: (305) 358-2382
smarks@podhurst.com
apodhurst@podhurst.com
lbucciero@podhurst.com
mweinshall@podhurst.com
kinfante@podhurst.com
projas@podhurst.com

**BOIES SCHILLER FLEXNER LLP**

/s/ Stephen N. Zack
Stephen N. Zack (Fla. Bar. No. 145215)
Bruce Weil (Fla. Bar. No. 816469)
James Lee (Fla. Bar. No. 67558)
Marshall Dore Louis (Fla. Bar. No. 512680)
100 Southeast 2nd Street, Suite 2800
Miami, FL 33131
Tel: (305) 539-8400
Fax: (305) 539-1307
szack@bsfllp.com
bweil@bsfllp.com
jlee@bsfllp.com
mlouis@bsfllp.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record and any other electronic filer as of the time of the filing.

/s/ Steven C. Marks
Steven C. Marks)
